UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

G & G CLOSED CIRCUIT EVENTS, LLC,

                              Plaintiff,

                    -v.-

JUAN PEREZ, *individually and doing business as*
40/40 CLUB; KRYSTIAN SANTINI, *individually
and doing business as* 40/40 CLUB; and
TWENTY ONES INCORPORATED, *an unknown
business entity doing business as* 40/40 CLUB,

                              Defendants.

21 Civ. 6210 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:

On the night of November 2, 2019, patrons of Manhattan's 40/40 Club watched Saul "Canelo" Álvarez knock out Sergey Kovalev in the eleventh round of the World Boxing Organization's World Light Heavyweight Championship Fight Program (the "Fight"). In this suit, Plaintiff G & G Closed Circuit Events, LLC ("G & G" or "Plaintiff") alleges that the 40/40 Club's owner and management failed to purchase a license to show the Fight in violation of two federal anti-piracy statutes. Now before the Court are the parties' cross-motions for summary judgment. Because a third party, and not Plaintiff, held the commercial rights to the Fight at the time Plaintiff filed this suit, the Court grants Defendants' motion for summary judgment and denies Plaintiff's cross-motion for summary judgment.

# BACKGROUND[1]

## A.    Factual Background

Plaintiff is a closed circuit distributor of sports and entertainment programming.  (Gagliardi Aff. ¶¶ 3-4).  It purchases commercial distribution

---

[1]    The facts set forth in this Opinion are drawn from the parties' submission in connection with their respective motions for summary judgment.  The Court draws primarily from Plaintiff's Local Civil Rule 56.1 Statement of Material Undisputed Facts (Dkt. #44 ("Pl. 56.1")), Defendants' Response to Plaintiff's Local Civil Rule 56.1 Statement (Dkt. #62 ("Def. 56.1 Response")), Defendants' Local Civil Rule 56.1 Statement of Material Undisputed Facts (Dkt. #52 ("Def. 56.1")), Plaintiff's Response to Defendants' Local Civil Rule 56.1 Statement (Dkt. #59 ("Pl. 56.1 Response")), and Defendants' Reply to Plaintiff's Response to Defendants' Local Civil Rule 56.1 Statement (Dkt. #66 ("Def. 56.1 Reply")).

Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein.  Where a fact stated in a movant's Rule 56.1 Statement is supported by evidence and denied with merely a conclusory statement by the opposing party, the Court finds such fact to be true.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be submitted by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

The Court draws additional facts from the declarations and affidavits submitted by the parties and the exhibits attached thereto, including: the Affidavit of Nicholas J. Gagliardi (Dkt. #41 ("Gagliardi Aff.")) and the Declaration of Nicholas J. Gagliardi (Dkt. #57 ("Gagliardi Decl.")); the Declaration of Andrea Thomas (Dkt. #49 ("Thomas Decl.")); the Declaration of Guy Laughridge (Dkt. #56 ("Laughridge Decl.")); the Declaration of Juan Perez (Dkt. #50 ("Perez Decl.")); the 2019 Master Service Agreement and its exhibits, included as Exhibit E to the Declaration of Paul Maslo (Dkt. #53-5 (the "2019 MSA")); Statement of Work 4, included as Exhibit F to the Declaration of Paul Maslo (Dkt. #53-6 ("SOW 4")); and the 2020 Master Service Agreement and its exhibits, included as Exhibit G to the Declaration of Paul Maslo (Dkt. #53-7 (the "2020 MSA")). Other facts sourced from the declarations, affidavits, and their accompanying exhibits are cited using the convention "[Name] Decl., Ex. []."

For ease of reference, the Court refers to Plaintiff's Memorandum of Law in Support of its Motion for Summary Judgment as "Pl. Br." (Dkt. #43), Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment as "Def. Opp." (Dkt. #60), and Plaintiff's Reply Memorandum of Law in Further Support of its Motion for Summary Judgment as "Pl. Reply" (Dkt. #63).  The Court refers to Defendants' Memorandum of Law in Support of their Motion for Summary Judgment as "Def. Br." (Dkt. #48), Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment as "Pl. Opp." (Dkt. #58), and Defendants' Reply Memorandum of Law in Further Support of their Motion for Summary Judgment as "Def. Reply" (Dkt. #65).

rights from entertainment producers and then subleases those rights to bars, clubs, restaurants, and other commercial establishments that wish to show the programs.  (*See id*.).  Plaintiff contracted with one such entertainment producer, DAZN, for the exclusive commercial distribution rights to the Fight for a period beginning May 1, 2019.  (*See generally* 2019 MSA; SOW 4).  That contract specifies that Plaintiff's rights in the Fight, including its right to bring legal action against unauthorized broadcasters, revert to DAZN upon the contract's termination or expiration (2019 MSA § 8(a)), but, as discussed in detail later in this Opinion, the parties dispute when the contract expired.

Defendant Twenty Ones Incorporated ("Twenty Ones") owns and operates the 40/40 Club, a sports bar and lounge near Madison Square Park in Manhattan.  (Pl. 56.1 ¶¶ 6-7).  Individual defendants Krystian Santini and Juan Perez are listed as principals on Twenty Ones's liquor license for the 40/40 Club.  (*Id.* ¶ 8).  Plaintiff asserts that Perez is Twenty Ones's Chief Executive Officer (*id.* ¶ 10), though Perez maintains that his involvement in the 40/40 Club "has always been extremely limited" (Perez Decl. ¶ 3).

The parties agree that the Fight was shown to over 200 patrons of the 40/40 Club on the night of November 2, 2019 (Pl. 56.1 ¶¶ 14, 17, 19-20), but disagree about whether Twenty Ones, Santini, and Perez (collectively, "Defendants") obtained a license from Plaintiff to do so.  Plaintiff maintains that Defendants did not order the Fight from Plaintiff or pay the $2,800 commercial sublicense fee.  (Pl. 56.1 ¶¶ 12-13).  For their part, Defendants claim that they ordered the Fight from Guy Laughridge, the 40/40 Club's sales representative

at G & G.  (Def. 56.1 ¶ 23).  Per Laughridge's instructions, Defendants assert, they purchased a DAZN subscription and streamed the Fight through DAZN's internet-based application.  (*Id.* ¶¶ 24-31).  Defendants concede that they did not pay Plaintiff the sublicense fee, but explain that they offered to do so upon realizing that Plaintiff never invoiced the 40/40 Club for the Fight.  (*Id.* ¶¶ 32-34).

## B.   Procedural Background

Plaintiff initiated this action by filing the Complaint on July 21, 2021. (Dkt. #1).  After the Court granted Defendants' request for an extension of the answer deadline (Dkt. #16-17), Defendants filed a joint answer on September 3, 2021 (Dkt. #18).

At the joint request of the parties, the Court adjourned the initial pretrial conference in this matter *sine die*.  (Dkt. #29).  The same day, the Court entered the parties' proposed case management plan and scheduling order and the case proceeded to discovery.  (Dkt. #30).

In the course of discovery, Defendants served a subpoena on non-party DAZN.  (Dkt. #31-3).  Plaintiff moved to quash that subpoena on April 7, 2022, arguing that the information sought from DAZN implicated Plaintiff's privileged, private, and/or proprietary interests.  (Dkt. #31).  Defendants filed a brief opposing that motion on April 14, 2022.  (Dkt. #34).  The Court held a telephonic pretrial conference on April 20, 2022.  Following that conference, the Court issued an Order (i) extending the fact discovery deadline to May 30,

2022, (ii) denying Plaintiff's request to file a reply brief in further support of its motion to quash, and (iii) denying Plaintiff's motion to quash.  (Dkt. #35).

On June 14, 2022, the parties filed a joint letter confirming that all discovery had concluded other than production from DAZN and proposing a scheduling for briefing on anticipated cross-motions for summary judgment. (Dkt. #36).  The Court adopted the parties' proposed briefing schedule (Dkt. #37), and subsequently granted the parties' request for an extension of those deadlines (Dkt. #39).

The parties then briefed their cross-motions for summary judgment. Plaintiff filed its motion for summary judgment and accompanying papers on August 5, 2022 (Dkt. #40-46), as did Defendants (Dkt. #47-54).  Both parties filed their oppositions and accompanying papers on September 6, 2022.  (Dkt. #55-58 (Plaintiff's opposition); Dkt. #59-62 (Defendants' opposition)).  Finally, each party filed replies in further support of their respective motions on September 27, 2022.  (Dkt. #63 (Plaintiff's reply); Dkt. #65-66 (Defendants' reply)).  The Court now considers these cross-motions.

## DISCUSSION

### A.   Applicable Law

#### 1.   Summary Judgment Under Federal Rule of Civil Procedure 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322

(1986).[2]  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely disputed "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

While the moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact," *Celotex Corp.*, 477 U.S. at 323, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Brown* v. *Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).  Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Parks Real Estate Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (citing Fed. R. Civ. P. 56(e)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).  In considering "what may reasonably be inferred" from evidence in the

---

[2]      The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination.").  This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

record, however, the Court should not afford the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *County of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)). Moreover, "[t]hough [the Court] must accept as true the allegations of the party defending against the summary judgment motion, ... conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak* v. *City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citation omitted) (citing *Matsushita*, 475 U.S. at 587).

### 2.    Federal Anti-Piracy Laws

The anti-piracy provisions of the Communications Act of 1934, 47 U.S.C. § 605, and the Cable Communications Policy Act of 1984, 47 U.S.C. § 553, prohibit the unauthorized use or publication of certain communications. Section 605 of the Communications Act prohibits the unauthorized interception of wire and radio transmissions:

> [N]o person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception[.]

47 U.S.C. § 605(a); *see also Int'l Cablevision, Inc.* v. *Sykes*, 997 F.2d 998, 1007 (2d Cir. 1993) ("*Sykes I*") (describing the reach of Section 605). The radio communications covered by Section 605 "ha[ve] long been understood to include satellite transmissions." *Joint Stock Co. Channel One Russia Worldwide* v. *Infomir LLC*, No. 16 Civ. 1318 (GBD) (BCM), 2017 WL 696126, at *8 (S.D.N.Y. Feb. 15, 2017), *report and recommendation adopted*, 2017 WL 2988249

(S.D.N.Y. Mar. 27, 2017).  Section 553(a)(1) of the Cable Communications

Policy Act similarly prohibits the unauthorized interception or receipt of cable

programming:

> No person shall intercept or receive or assist in
> intercepting or receiving any communications service
> offered over a cable system, unless specifically
> authorized to do so by a cable operator or as may
> otherwise be specifically authorized by law.

47 U.S.C. § 553(a)(1).  Together, these provisions protect operators' rights in

wire, radio, and cable signals.  Sections 605 and 553 each provide a cause of

action for rightsholders injured by the unauthorized pirating of covered

communications.  47 U.S.C. §§ 553(c)(1), 605(e)(3)(A).

Sections 605 and 553 are not mutually exclusive.  *Kingvision Pay-per-

View, Ltd.* v. *Perez*, No. 06 Civ. 3613 (DAB), 2008 WL 3982881, at *3 n.6

(S.D.N.Y. Aug. 27, 2008).  Section 553 is limited to transmissions via cable

systems, while the broader Section 605(a) applies to "the interception of cable-

borne, as well as over-the-air, pay television."  *Int'l Cablevision, Inc.* v. *Sykes*,

75 F.3d 123, 130 (2d Cir. 1996) ("*Sykes II*").  Thus, in some circumstances,

such as when television programming is transmitted over both cable and

satellite mediums, the same conduct will warrant liability under both statutes.

*See, e.g.*, *Cablevision Sys. N.Y.C. Corp.* v. *Lokshin*, 980 F. Supp. 107, 113

(E.D.N.Y. 1997).  In such cases, a successful plaintiff may recover "either

actual or statutory damages under either, but not both, of those statutes."

*Kingvision*, 2008 WL 3982881, at *3 (citing, *inter alia*, *Cmty. Television Sys.* v.

*Caruso,* 284 F.3d 430, 435 (2d Cir. 2002)).  Because Section 605 offers higher

statutory damages than Section 503, when both statutes are violated, courts award damages under Section 605.  See *Sykes I*, 997 F.2d at 1009.

A natural individual can be liable under Section 605 if, in addition to proving the elements described above, the plaintiff proves that the individual defendant either (i) authorized the violation or (ii) "had a right and ability to supervise the infringing activities and had an obvious and direct financial interest in the exploitation of the copyrighted materials."  *J & J Sports Prods., Inc.* v. *McAdam*, No. 14 Civ. 5461 (PKC) (CLP), 2015 WL 8483362, at *3 (E.D.N.Y. Dec. 9, 2015) (internal quotation marks omitted and alteration adopted).

## B.   The Court Grants Summary Judgment to Defendants Because Plaintiff Lacks Statutory Standing to Bring This Action

The Court begins by addressing whether Plaintiff is the proper entity to bring this suit.  Sections 553 and 605 provide causes of action to any "person aggrieved" by an unauthorized wire, radio, or cable transmission.  47 U.S.C. §§ 553(c)(1), 605(e)(3)(A).  As relevant here, an aggrieved person is "any person with proprietary rights in the intercepted communication[.]"  47 U.S.C. § 605(d)(6); *see also Kingvision*, 2008 WL 3982881, at *3 ("A plaintiff's possession of proprietary rights to an unlawfully intercepted communication satisfies [the "person aggrieved"] standard under both [Section 553 and Section 605].").  The Communications Act and the Cable Communications Policy Act do not themselves create proprietary rights; those rights are conferred independently, including by contract.  *See J & J Sports Prods., Inc.* v. *Vergara*, No. 19 Civ. 2382 (FB) (VMS), 2020 WL 1034393, at *10 (E.D.N.Y. Feb. 6, 2020)

(explaining that a plaintiff's ability to sue stemmed "from the license agreement"), *report and recommended adopted*, 2020 WL 1031756 (E.D.N.Y. Mar. 3, 2020).  A plaintiff must have proprietary rights in the subject communication at the time it files its suit.  *See id.* at *9.

The parties agree that the 2019 Master Services Agreement (the "2019 MSA") granted Plaintiff an enforceable proprietary right in the broadcasts of several sporting events, including the Fight, for a period beginning on May 1, 2019.  Their positions differ, however, as to when (and whether) Plaintiff's rights in the Fight reverted back to DAZN.  In Defendants' view, Plaintiff's proprietary interest in the Fight ended on December 31, 2019,[3] when the 2019 MSA expired, and thus Plaintiff was not a "person aggrieved" when it initiated this action in July 2021.  (Def. Br. 8-11).  Plaintiff disagrees.  It asserts that the parties modified the 2019 MSA, either explicitly or through a course of conduct, to grant Plaintiff rights in the Fight beyond the 2019 MSA's listed expiration date.  (Pl. Opp. 6-10).  Additionally, Plaintiff maintains that Defendants' contractual standing argument is not properly before the Court because Defendants are not third-party beneficiaries of the agreement between Plaintiff and DAZN and therefore cannot enforce it.  (*Id.* at 4-5).

The Court takes Plaintiff's arguments in reverse order, and begins by rejecting Plaintiff's contention that Defendants may not argue about the

---

[3]     Defendants' opening memorandum of law repeatedly lists the 2019 MSA's termination date as December 31, 2020.  (Def. Br. 8-9).  The Court assumes that this is a typographical error and that Defendants intended to cite the December 31, 2019 termination date listed in Section 10 of the contract.  (*See* 2019 MSA § 10).

meaning of the contracts between Plaintiff and DAZN because Defendants are not third-party beneficiaries of those contracts.  (*See* Pl. Opp. 4-5).  It is true that under New York law, a non-party may only enforce a contract if the contract's terms "clearly evidence an intent to permit enforcement by the third party[.]"  *Premium Mortg. Corp.* v. *Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (quoting *Fourth Ocean Putnam Corp.* v. *Interstate Wrecking Co.*, 66 N.Y.2d 38, 45 (1985)) (alteration adopted).  But Defendants are not seeking to enforce the MSAs — their argument is that at the time Plaintiff initiated this action it did not have proprietary rights in the Fight, and thus cannot be a "person aggrieved" under Sections 553 and 605.  (Def. Br. 8-11).  Deciding this question of federal law requires the Court to look at and interpret the underlying contracts, but not to enforce them.  Courts routinely perform the type of contractual analysis Defendants urge here in similar cases.  *See, e.g.*, *Vergara*, 2020 WL 1034393, at *9-11; *J & J Sports Prods., Inc.* v. *Ahuachapan Corp.*, 422 F. Supp. 3d 652, 663 (E.D.N.Y. 2019); *J & J Sports Prods., Inc.* v. *4326 Kurz, Ltd.*, No. 07 Civ. 3850 (WHY), 2009 WL 1886124, at *10-12 (E.D. Pa. June 30, 2009).

Finding the contracts properly before the Court, the Court turns to their substance.  In the 2019 MSA, DAZN granted Plaintiff "the exclusive right to sublicense certain DAZN events … specified in [Statements of Work ("SOWs") 1 and 2] as well as Events described within any future applicable SOWs, if any[.]" (2019 MSA § 1).  SOW 1 and SOW 2, which were each executed in May 2019, cover fights scheduled for May 4, 2019, June 1, 2019, and June 8, 2019.  (*Id.*,

Ex. A (SOW 1), B (SOW 2)).  SOW 4, which was executed by Plaintiff and DAZN

on October 1, 2019, extends the 2019 MSA to the November 2, 2019 fight at

issue in this case along with two additional fights scheduled for November 9,

2019, and December 7, 2019, respectively.  (SOW 4 at 1).  Each SOW details

how Plaintiff and DAZN will share revenue from sublicenses of the covered

events.  (SOW 1; SOW 2; SOW 4).

In addition to granting Plaintiff exclusive sublicensing rights, the 2019

MSA delegates to Plaintiff authority to bring legal action against those who

show the covered events without authorization.  It grants Plaintiff "the right to

identify and thereafter prosecute any and all acts of alleged piracy of the

[covered events] … subject to Reserved Rights and any other exclusions

subsequently agreed upon by [DAZN] and [Plaintiff] and thereafter

memorialized in an applicable SOW."  (2019 MSA § 8(a)).  The contract requires

Plaintiff to provide DAZN "advanced, written notice of potential suit filings"

prior to commencing litigation.  (*Id.* § 8(b)).[4]

The 2019 MSA also anticipates its expiration.  It specifies that "all rights

licensed or otherwise transferred to [Plaintiff] hereunder, … shall cease and

revert to DAZN" upon the contract's "expiration or termination[.]"  (2019 MSA

§ 8(d)).  The "Term and Termination" provision of the 2019 MSA defines the

---

[4]     Defendants offer as an alternative ground for summary judgment the fact that Plaintiff
did not give DAZN written notice prior to commencing this suit.  (Def. Br. 11; *see also*
Pl. Opp. 9 (conceding this fact)).  Plaintiff's failure to inform DAZN of its intent to sue
may constitute a breach of contract.  But the 2019 MSA does not say that Plaintiff's
rights in the Fight immediately revert to DAZN if Plaintiff causes such a breach, and
thus the Court does not find this fact relevant to its "aggrieved person" analysis.

contract's term as May 1, 2019, through December 31, 2019, "unless extended in writing by mutual agreement of the parties." (*Id.* § 10).

On January 16, 2020, the parties entered into a new Master Services Agreement (the "2020 MSA"). Like the 2019 MSA, the 2020 MSA grants Plaintiff the exclusive right to sublicense the rights to DAZN events identified in SOWs. (2019 MSA § 1). The 2020 MSA contains a merger clause that specifies that it "supersedes and terminates all prior agreements between the parties hereto … with respect to the subject matter contained herein" and "embodies the entire understanding between the parties relating to such subject matter[.]" (*Id.* § 16). Unless extended by written agreement, the 2020 MSA expires on December 31, 2020. (*Id.* § 10).

Defendants are entitled to summary judgment because Plaintiff's proprietary interest in the Fight reverted to DAZN months before Plaintiff commenced this action. To begin, Defendants have a strong argument that Plaintiff's interest terminated on December 31, 2019. That is the natural expiration of the 2019 MSA's term. (2019 MSA §§ 8(d), 10). Although the contract's term can be extended through a signed writing (*id.* § 10), the parties entered a new MSA in January 2020 that explicitly superseded all prior related agreements between the parties (2020 MSA § 16). The 2020 MSA is similar in form and substance to the 2019 MSA, but differs in significant respects: for instance, the 2019 MSA specifies the amount of gross revenues that DAZN is entitled to beyond the guaranteed minimum payment for certain exhibitions of covered events (2019 MSA § 3(b)), but the 2020 MSA specifies that the

13

applicable SOWs will define the parties' revenue split (2020 MSA § 3(b)).

Changes like this, along with the 2020 MSA's merger clause, indicate that in

January 2020, the parties renegotiated the terms of their relationship rather

than extending their 2019 agreement.  Accordingly, Plaintiff's interest in the

Fight, and thus its status as an "aggrieved person," likely reverted to DAZN at

the end of 2019.

The outcome would be the same even if the Court were to consider

SOW 4 to be a written modification that extended the term of the 2019 MSA.

SOW 4 applies to the Fight, which occurred within the 2019 MSA's original

term.  (SOW 4 at 1).  But SOW 4 also contemplates potentially covered events

occurring after December 31, 2019: "Additional boxing events scheduled to be

broadcast on DAZN prior to January 30th, 2020, … may be offered by [Plaintiff]

as an 'Event Package' upon DAZN's approval."  (*Id.*).  There is no evidence in

the record that Plaintiff offered any such January 2020 Event Package.  And

even if SOW 4 extended the 2019 MSA beyond its natural expiration, it only

extended the contract term through January 16, 2020 (the 2020 MSA's

effective date) or January 30, 2020 (the latest date mentioned in SOW 4).[5]  For

SOW 4 to grant Plaintiff statutory standing to pursue the instant claims, it

would have to grant Plaintiff rights to the Fight through at least July 2021, the

---

[5]     Plaintiff argues that the 2020 MSA did not supersede the 2019 MSA because the two
contracts deal with different subject matter (specifically, different covered events).  (Pl.
Opp. 7-8).  This argument does not raise a triable dispute because even accepting the
possibility that the two contracts were both in effect for some overlapping period,
Plaintiff offers no evidence that the term of the 2019 MSA (as modified by SOW 4)
continued beyond January 30, 2020.

date Plaintiff filed this suit.  Such an argument is contradicted by the 2019 MSA's plain text: Its "Term and Termination" clause clearly evinces the parties' intent for Plaintiff's right to sue to revert to DAZN upon the agreement's expiration.  (*See* 2019 MSA § 8(d)).  The Court will not find that SOW 4 nullified that clause *sub silentio* and granted Plaintiff enforcement rights in perpetuity. *See Vergara*, 2020 WL 1034393, at *10 (rejecting implausible interpretation of license agreement that would grant sublicensee a perpetual right to sue for unauthorized broadcasts).  At the latest, Plaintiff's rights in the Fight expired at the end of January 2020.

The Court recognizes that a court in the Southern District of California took a different approach in resolving a similar issue.  *G & G Closed Circuit Events, LLC* v. *California Center for the Arts* involved claims by Plaintiff against a California-based arts center for the allegedly unauthorized broadcast of the same Fight at issue in this case.  No. 20 Civ. 2137 (LL) (NLS), 2022 WL 598059 (S.D. Cal. Feb. 28, 2022).  The California district court denied the art center's motion for summary judgment on Plaintiff's Section 553 and Section 605 claims, citing "numerous disputed issues[.]"  *Id.* at *4.  As relevant here, it also denied summary judgment on Plaintiff's state-law conversion claim.  *Id.*  The arts center argued that the conversion claim should fail as a matter of law because Plaintiff's rights under the 2019 MSA reverted to a third party (presumably DAZN) on December 31, 2019.  *Id.*  The California district court rejected this argument, finding that Plaintiff's evidence that an amendment to the original contract (presumably SOW 4) preserved Plaintiff's proprietary

15

rights in the Fight created a triable issue of fact as to Plaintiff's standing to pursue the conversion claim. *Id.*

The Court is not persuaded by *California Center for the Arts*. In addition to not being binding on this Court, the decision contains at least one claim — conversion — not present in this case. More importantly, the law is clear that a court may determine the meaning of a contract at the summary judgment stage if the contract language is unambiguous or if the ambiguity in the contract language can be resolved through a legal, rather than factual, construction of the contract terms. *See Compagnie Financiere de CIC et de L'Union Europeenne* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 232 F.3d 153, 157-58 (2d Cir. 2000); s*ee also Andy Warhol Found. for Visual Arts, Inc.* v. *Fed. Ins. Co.,* 189 F.3d 208, 215 (2d Cir. 1999). As detailed above, the Court finds the meaning of the relevant contracts to be unambiguous without the need for additional factfinding.

As a fallback position, Plaintiff argues that the record demonstrates that "the parties to the MSA have developed a course of conduct by which it is clearly confirmed that the agreement has been extended beyond the original termination date." (Pl. Opp. 9). It does not. Plaintiff's only support for this argument is an amorphous reference by its President to a course of conduct that has persisted throughout its relationship with DAZN, and on which Plaintiff has relied in "exercising its authority and obligations under the original MSA and subsequent Statements of Work." (Gagliardi Decl. ¶¶ 7-8). But shorn of any details regarding the parameters of any such course of

conduct — indeed, absent disclosure of a single incident in which the parties to the MSA extended its termination date, much less a repeated course of conduct that would evince a common understanding either to extend the termination date or to forestall the reversion of proprietary rights to DAZN — the Court finds that Plaintiff has failed to identify a genuine dispute of material fact concerning its standing to bring this action.  *Cf. CMA CGM (Am.) L.L.C.* v. *Seafood Expert W. Inc.*, No. 13 Civ. 2839 (VSB), 2015 WL 1564996, at *8 (S.D.N.Y. Mar. 31, 2015) (concluding that two episodes were insufficient to establish a course of dealing) (collecting cases).

From the record before it, the Court concludes that Plaintiff had a proprietary right in the Fight from May 1, 2019, until sometime between December 31, 2019, and January 30, 2020.  But by the time Plaintiff initiated this action in July 2021, that right had indisputably reverted to DAZN. Because Plaintiff is not an "aggrieved person" under Sections 553 and 605, it lacks statutory standing to prosecute the instant claims and Defendants are entitled to summary judgment.[6]

---

[6]    Although the Court does not reach the merits of Plaintiff's Section 553 and 605 claims, it notes that questions of fact, including whether Plaintiff authorized Defendants to stream the Fight at the 40/40 Club, would likely preclude a grant of summary judgment to either party.  (*Compare* Thomas Decl. ¶¶ 4-7 (declaration of the 40/40 Club's Office Manager) (averring that Defendants purchased a DAZN subscription and streamed the Fight via DAZN at Plaintiff's instruction), *with* Laughridge Decl. ¶¶ 4-15 (declaration of the 40/40 Club's G & G Sales Representative) (denying that Plaintiff instructed Defendants to stream the Fight via DAZN and denying that Defendants expressed an interest in showing the Fight at the 40/40 Club)).  The Court expresses no opinion as to how it would rule on the merits if they were presented by a proper party.

## CONCLUSION

Because Plaintiff was not an "aggrieved person" under Sections 553 and 605 when it commenced this action, Defendants' motion for summary judgment is GRANTED and Plaintiff's cross-motion for summary judgment is DENIED.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      January 31, 2023
            New York, New York

_____
            KATHERINE POLK FAILLA
            United States District Judge